| | | |
|---|---|---|
| July Term, | Piedmont Coal and Iron Co. *vs.* Green *et al.* | 1868. |

# Wheeling.

#### *Absent, HARRISON, J.

## PIEDMONT COAL AND IRON COMPANY *vs.* DUFF GREEN *et al.*

### July Term, 1868.

A party files his bill in the county court of Alleghany county, Maryland, to enforce vendor's lien and for a sale of real estate, lying partly in the State of Maryland and partly in the State of Virginia, to satisfy unpaid purchase money. The Maryland court decreed the payment of the purchase money, and in default a sale of the lands in Maryland, and that the proceeds of sale be applied *pro-tanto* to the payment of the purchase money ; the court first seeing that the title to the Maryland lands was perfected before sale, and the dower right of the vendor's wife relinquished. HELD :

> That the Maryland court might have decreed a sale of the lands in Virginia also, and applied the proceeds to the payment of the purchase money, and as incidental thereto it might have compelled the parties before it to unite in conveying the Virginia lands to its commissioner, and had them sold and conveyed by him under its order, and it might upon having a proper case made requiring an investigation of the validity of the vendor's title to the Virginia lands have instituted an inquiry in that behalf, and tested the title to the same by the laws of Virginia. And however inconvenient, and perhaps unsatisfactory, such an investigation might have proved in a foreign court, and however appropriate and preferable it might be supposed to have had the question of title to the Virginia lands investigated and determined under the laws of Virginia by a Virginia court, yet the decree of the Maryland court is conclusive upon the parties in such case of every thing so considered and in fact determined, unless perhaps the Virginia court should plainly see that the Maryland court had clearly mistaken the law of Virginia applicable to the case.

> 2. In a suit brought in the State of Maryland to enforce the vendor's lien on a contract for the sale of real estate, lying partly in Maryland and partly in Virginia, a decree of the Maryland court, directing a sale of the Maryland lands only, and when neither the court nor the parties to the suit contemplated a sale of the Virginia lands, such decree neither determines nor concludes any thing respecting the title to the lands in Virginia, nor does the

* See page 1.

Maryland decree operate as an estoppel to inquiry in a subsequent suit by a Virginia court into the question of title to the lands in Virginia.

3. In any inquiry had by a Virginia court respecting alleged defects of title to the lands in Virginia, the question should not be exclusively as to what defects existed in the vendor's title at the time of sale, but rather what defects exist therein at the time of such investigation, which would defeat the possession or enjoyment of the land by the vendee.

4. Where a vendee of real estate has had and held possession thereof under title from his vendor, until defect of title has been cured by lapse of time or the statute of limitations, he is not allowed to set up such pretended defect, however defective the title may have been at the time of the purchase.

On the 21st day of April, 1836, John Brant, of Alleghany county, Maryland, sold to General Duff Green, of Washington city, by written indenture, several tracts or parcels of land, part of them situated in the State of Maryland and the rest in the State of Virginia, in consideration of 1,250 dollars paid by said Green to said Brant, on the 28th day of February, prior to the date of said contract, and seven thousand seven hundred dollars to be paid on the 15th of July, 1836, and the further sum of eight thousand two hundred and fifty dollars to be paid on the 15th day of May, 1837. On the 8th day of October, 1838, Brant filed his bill in the county court of Alleghany county, Maryland, to enforce his vendor's lien, and for a sale of the lands to satisfy the purchase money remaining unpaid. The Maryland court decreed that Green pay the purchase money less the payments made in part, in a given time, and upon default, that the lands in Maryland be sold, and the proceeds applied *pro tanto* to the debt; which was done, the said court first however seeing that the title to the Maryland land was perfected before sale by a deed with general warranty from Brant to Green, with the relinquishment of the dower right of Brant's wife to the same. The bill in the Maryland court was general, and prayed for a sale of the lands without limiting the prayer to the Maryland lands. But no decree was had to subject to sale any of the Virginia lands.

On the 8th day of May, 1839, Green assigned the Virginia lands to the "Union Potomac Company" by endorsement on the contract between Brant and himself, and these lands were afterwards conveyed to the appellants by the name of the "New Creek Company," which was subsequently changed by act of the general assembly of Virginia to the "Piedmont Coal and Iron Company." On the 2d day of July, 1840, and before the sale of the lands in Maryland, under the decree of the county court of Alleghany, Brant filed his bill in the circuit court of Hampshire county, Virginia, against Green alone, setting out the argreement between himself and Green, and praying a specific performance of the same, a decree for the purchase money and general relief. In November, 1844, Green filed his answer thereto, alleging defects in the titles of the Virginia lands. In May, 1848, Brant's death was suggested, and in July, following, the administrator of Brant filed an amended bill, in which, for the first time, the suit pending in Alleghany county, Maryland, and the decree of April term, 1840, of that court for the sale of the Maryland lands, which was rendered with the consent of the solicitors of the complainant and defendant, was referred to and relied on to preclude Green from the defense set up in his answer to the original bill. The amended bill also alleged that the suit in Maryland was instituted by Brant against Green for a specific performance of his agreement as to the Maryland lands, and for a decree of sale in default of the payment of the purchase money, and that the Maryland suit was instituted in October, 1838. It was alleged that the consent decree rendered in that cause concluded all defense by Green as to defects of title to the lands in Virginia, on the ground that the decree was passed by consent; that the lands in Maryland should be sold if Green did not by a certain day pay what was due on the contract, which was not in the Maryland decree made liable to any deduction for want of title. In September, 1852, Green filed his answer to the amended bill, in which he denied that he was bound by the consent decree rendered in the Maryland suit, so as to conclude him from his de-

COURT OF APPEALS OF WEST VIRGINIA.            57

July Term,      Piedmont Coal and Iron Co. *vs.* Green *et al.*            1868.

fense for defect of title to the Virginia lands, and insisted on such defects. The cause was referred to a master commissioner who made report of the amount due from Green on the contract, in which no deduction for defect of title was made, and on the report, exceptions to which were overruled by the court, the decree of 20th of September, 1854, was rendered, confirming the report of the master, and decreeing that the complainant recover of the defendant Duff Green 15,196 dollars and 69 cents with six per cent. per annum interest on 9,720 dollars and 20 cents, part thereof, from the 10th of September, 1851, till paid, and the costs of suit, and in default of payment on or before the 20th of December, following, a sale of the Virginia lands were ordered to be made by the sheriff of Hampshire county, to satisfy the amount decreed the complainant. In 1855, Green filed his bill in the cause to rehear and review the decree of September, 1854, and to enjoin the sale which was advertised under it, and subsequently said bill of review was amended in which was set up a claim asserted by Charles Sherman against Green, for one-half of a tract of 5,645¼ acres, embraced in the contract between Brant and Green. Depositions were taken in the cause, and thereupon the circuit court of Hampshire county rendered its decree in April, 1859, on the bill of review, by which the injunction awarded to Green was dissolved as to all the land except the one undivided half of the tract of 5,645¼ acres, and also dissolved as to 5,592 dollars and 3 cents, with interest thereon, from the 21st of April, 1842, till paid, that being the balance of the purchase money according to the report of the master, after deducting the sum of one dollar per acre for one-half of the tract of 5,645¼ acres, for the recovery of which Sherman had instituted his suit, with liberty to Brant's administrator to move the court thereafter to dissolve the injunction as to the residue of the purchase money, and as to the said half of the said 5,645¼ acres of land; and appointing a commissioner to vest the title to all of said lands in said Green, except the moiety of the 5,645¼ acres, and retaining in said deed a lien for 3,728 dollars and

67½ cents, with interest on 2,822 dollars and 62½ cents, part thereof, from the 21st of April, 1842, till paid; if it should be decided that the same should be due and payable; and upon default of the payment to Brant's administrator by Green, or the Piedmont Coal and Iron Company, of the 5,592 dollars and 3 cents, with interest from the 21st of April 1842, till paid, directing the sheriff of Hampshire county to sell all of said lands in Virginia, except the undivided moiety of the 5,645¼ acres.

The Piedmont Coal and Iron Company appealed to the supreme court of appeals of Virginia, and the cause was removed to, and the record filed, under the statute, in this court.

*Lamb* & *Paull* and *Boggess* for the appellants.

*Charles J. Faulkner*, for the appellees Brant and Beall, maintained :

1st. That the decree rendered by the county court of Alleghany county, State of Maryland, on the 1st of May, 1840, was conclusive upon all the material points involved in the present case; conclusive as between Brant and Green, because they were *parties ;* conclusive as to the Piedmont Coal and Iron Company, because assignees, *pendente lite,* and with full *notice* of the equities of Brant. Upon the bill filed for the specific performance of the contract for the sale of land, the Maryland court adjudicated the ability of Brant to make title; it approved the deeds tendered by Brant and wife, and rendered a decree against Green for the entire purchase money. It cannot surely impair the legal effect of this decree, that it was rendered with the full *consent* of Green, entered of record, and repeatedly *ratified* by subsequent agreements appearing in the case. Upon the conclusiveness of this decree, he cited 1 Greenleaf Evidence, sec. 534; and upon the credit and effect due to a judgment or decree of one State, in the courts of another State, cited *Mills* vs. *Duryee*, 7 Cranch, 481; *Hampton* vs. *McConnell,* 3 Wheat., 234; 2 Leigh, 271.

2d. It cannot detract from the conclusiveness of this Maryland decree, that a portion of the subject matter of this contract was lands lying *within the State of Virginia.* The power of a court of chancery, through its jurisdiction over the person, to act upon *an entire contract,* and to adjudicate all rights under it, although growing out of, or affecting *lands in another State,* is a doctrine too well established to be now controverted.  *Massie* vs. *Watts,* 6 Cranch, 158; *Watts* vs. *Waddle,* 6 Peters, 397; *Watkins* vs. *Holman,* 16 Peters, 57; *Vanmeter's Executor* vs. *Vanmeter,* 3 Gratt., 148; Wyth's Reports, *Farley* vs. *Shippen,* 135; *Guerrant* vs. *Fowler,* 1 Hen. and Munf.; 4 *Humphries* vs. *McClanahan's Administrator,* 1 Munf., 501.

3d. Nor is the conclusiveness of the Maryland decree, so far as it establishes Brant's ability to give a good title, impaired by the fact that it limits its order satisfying the decree to the *sale of the Maryland lands.*  The Alleghany court, after passing upon the whole subject matter of the contract, and exhausting the fund within its jurisdiction in part satisfaction of its decree, properly left the complainant to pursue the further satisfaction of his decree against the Virginia lands in the courts of Virginia.  Real estate in one country cannot be transferred by the decree of a court of equity in another country, for the simple reason that the court making the decree has no power to enforce it, by the execution of *process* in such other country.  *Earl of Athol* vs. *Earl of Derby,* 1 Chancery Cases, 221; *Roberdean* vs. *Rous,* 1 Atk., 544; *Bishop of Soder and Mann* vs. *Derby,* 2 Vesey, Sen., 357; *Watts* vs. *Waddle,* 6 Peters, 401.  It was on this ground that the court of appeals of Virginia decided that dower or partition of lands lying in North Carolina ought not to be decreed.  *Blunt, &c.,* vs. *Gree,* 5 Call, 512.  But this want of power to reach the subject from which the decree is to be satisfied, cannot impair the validity and effect of the decree, so far as it determines the rights of the parties under the *contract.*  6 Cranch, 160.  The Maryland court could not by its order of sale, or by its decree, or by the deed of its *commissioners,* pass the title to the Virginia lands.  Its power over

lands in another State is alone through the person of the owner.  1 Robinson's New Practice, 342; *McLawrin* vs. *Salmons*, 11 B. Monroe, Kentucky Rep., 96.  But having, as in this case, jurisdiction over the person of the defendant, and being satisfied that the deed embraced a proper conveyance both of the Virginia and Maryland lands, it properly decreed *a specific performance of the entire contract.*  Green stipulated to supply this want of power in the Maryland court, and to dispense with the necessity of a suit in Virginia, by his agreement, of the 14th of August, 1841, by which he covenanted to convey the Virginia lands, by a deed of trust, to the persons designated as commissioners of sale of the Maryland land, but he failed to comply with his agreement.

4th.  Specific execution of a contract will be decreed not only between vendor and vendee, but also between those claiming under them in privity of estate, or of representation, or of title.  Dart on Vendors and Purchasers, 461; 2 Story Equity Jurisprudence, sections 788, 789.  From the time of the contract for the sale of land, the vendor as to the land becomes a trustee for the *vendee,* and the vendee, as to the purchase money, a trustee for the *vendor,* who has a lien on the land therefor; and every subsequent *purchaser* from either, becomes subject to the same equities as the parties would be from whom he purchased.  6 Johnson's Chancery Reports, *Champion* vs. *Brown,* 402, 403.  But the suit in Virginia was not properly a bill for the specific performance of a contract.  The court will look at the *substance* not the *form* of the procedure.  In the Maryland court the specific execution of the contract had *already* been decreed. The contract as such had become *merged* in the decree of the court.  From that day Brant became a judgment creditor, with all the rights of such.  The bill filed by Brant in July, 1840, improperly and unskilfully presented his case.  In the amended bill, filed in 1848, by Brant's administrator, the case assumed its proper form, to wit: a suit to enforce payment of a decree rendered by a court of competent jurisdiction.

Whilst the contract as a specialty became merged in the higher evidence of a decree, it left unimpaired his equity, holding a vendor's lien, as against those who purchased with full notice of this equity.

The suit in Virginia was, therefore, strictly a proceeding by *foreign attachment*, against a non-resident, to enforce a decree of a Maryland court by the sale of lands in Virginia; these lands still remaining subject to the vendor's lien in the hands of the assignees, as they had admittedly purchased the equitable title, not only with notice of Brant's equity, but under a covenant to pay the unpaid purchase money.

5th. It is urged that the suit in Maryland was only intended to accomplish a sale of the Maryland lands, and was never treated as having any bearing upon the Virginia lands. This is a remarkable statement, and is utterly *disproved* by the bill, Exhibit A, the answer of Green, the consent order of April, 1840, the agreements of the 10th of October, 1840, and 14th of August, 1841, and above all, by the deed tendered, accepted by the defendant and approved by the court, and the decree for the whole purchase money. Had the Maryland lands brought the full amount of the debt, the cause would have ended there. Could the Maryland court have reached the fund in Virginia, there would have been no occasion for the present suit.

6th. It is alleged that Green was ignorant of the defects in the Virginia title, at the date of the Maryland decree; that he was first apprised of them by his counsel, Angus W. McDonald, and the date of his knowledge of the defects is fixed for the 15th of September, 1852, the date of McDonald's employment as counsel. This is specious reasoning, and might have some weight if it had not been expressly *disproved* by Green himself, who, in his bill of review, states that "prior to the Maryland decree, and at the time he filed his answer in that cause he well knew of certain defects of said Brant to his Virginia lands, which were apparent on the face of Brant's own title papers."

He further states in the same bill that "at the time that he entered into the agreement with Brant, he was informed by Brant that the title to some of the Virginia lands was defective, and that in some instances they were interfered with by older and better titles," and yet, with this full knowledge, he accepts the deed and *consents* to a. decree, adjudging him to pay the entire purchase money for the lands!

8th. It is argued that the evidence shows Brant's inability to make a title to the lands sold, and that Green is entitled to an abatement from the purchase money by the terms of the contract. This is denied. No evidence is admissible which is in conflict with the Maryland decree. If it be true, as already shown, that the Maryland decree has adjudicated the ability of Brant to convey according to his contract, then all evidence should be excluded which seeks to *revive an issue* which has already been adjudicated. It was well said by Judge Kennedy, *Marsh* vs. *Pier*, 4 Rawle, 288, 289, "A judgment of a proper court being a sentence or conclusion of the law, upon the facts contained within the record, puts an end to all further litigation on account of the same matter and *becomes the law of the case*, which cannot be changed or altered, even by consent of the parties, and is not only binding upon them, but upon the courts and juries, and afterwards, as long as it shall remain in force and unreversed."

If Green ever had any just cause to complain of the Maryland decree, he should have sought redress in the tribunals of that State, by bill of review, or by writ of error, or by a bill filed in this State, directly to impeach that decree for grounds upon which judgments may be declared void, but it cannot be *collaterally* impeached before this or any other forum.

8th. It is argued that the cross bill of Green is taken *for confessed*, and that this is an admission as strong as an answer would be, of the facts upon which the abatement of purchase money is demanded. The cross bill was filed against the administrator and heirs of Brant. Beall was

not made a party. All the defendants were *non-residents* except the administrator. The proceeding professes to be against them by order of publication, and yet there is *no evidence* in the record that the order was ever *executed* by either publication or posting. In the absence of such evidence, the execution of the order of publication *is not to be presumed.* *Hunter's Executors* vs. *Spottswood,* 1 Wash., 149; *Hadfield* vs. *Jamison,* 2 Munf., 58; *Gibson* vs. *White & Co.,* 3 Munf., 98; *Chapman* vs. *Harrison,* 4 Rand., 336; 2 Robinson's (Old Practice,) p. 326. Evidence of publication not sufficient, it must also *appear* that a copy was posted at the front door of the court-house. *Myreck* vs. *Adams,* 4 Munford., 366.

The cross bill was never *set for hearing* by the plaintiff, but seems to have passed totally unnoticed by plaintiff, defendants and the court—a fact, so far as the court and defendants were concerned, very satisfactorily explained by the absence of all evidence of publication and posting.

It was taken for confessed *at the rules*—never by any order or decree of the court. Such action in the clerk's office can practically amount to nothing. An office judgment, confirmed in an action of debt, becomes a *judgment* of the court by the statute, if not set aside; but no such provision extends to bills taken for confessed in the clerk's office. To give any effect to the confession, it must be taken, *pro confesso,* by an order or decree of the *court.* Such is the English practice, as well as our own. *Geary* vs. *Sheridan,* 8 Vesey, 191.

The extraordinary effect which the counsel for the appellants claim for a bill taken *pro confesso,* and the authorities cited, are founded upon recent British statutes, not upon any doctrine of the law of equity practice. See Smith's Chancery, 1 vol., p. 351, 352; Statute William 4, chap. 36, sec. 14. 2 Robinson's (Old Practice), p. 326; 2 Tucker Notes, 498, Equity Practice.

9th. If this court was at liberty to enquire into the validity of the title of the several tracts of land sold by Brant to Green, what is there in this record to impeach the valid-

ity of the title? The testimony of Angus W. McDonald, is mere *opinion*, and amounts to nothing. The testimony of Abraham Smith was *twice* taken and upon both occasions very properly *excepted to* as evidence. Such survey and examination of the lands as did take place was wholly *ex parte*, and without notice. It was made upon papers furnished by the counsel of Green and exclusively under his direction, and it is admitted that Smith had no knowledge of the location of the land except that which he derived from those papers and the instructions of McDonald. All who are familiar with surveys and plats made under such circumstances, know how little credit is to be attached to them. If a survey was *proper* it should have been ordered by the court, and if applied for, the refusal of the court to grant it would have been error; but this omission of the court to order a survey cannot be supplied by *ex parte* surveys made, nor can any weight be attached by this tribunal to apparent development proceeding from such an illegitimate *ex parte* source. In the case of *Johnson* vs. *Brown*, a survey annexed to the record, and *not excepted to in the court below*, accompanied by the deposition of the surveyor, was deemed admissible by the court of appeals of Virginia. 3 Call., p. 260. But this only because no exception was taken in the court below. Surveys taken on public occasions are evidence to ascertain the rights of individuals not named in them, but this proceeds upon the ground that the act being done under the direction of the public, for the purpose of determining a public question, is entitled to a degree of credit which no act of an individual is. Peake's Evidence, p. 86, 87. Such testimony in effect is simply his *opinion* as a surveyor, based upon the assumed genuineness of the papers placed in his hands by the counsel who employed him. It cannot have the force of evidence.

11th. Green has been substantially and for all practical purposes in possession of this land, from the date of the contract in 1836. The contract provides that he shall be authorized "to enter upon and use the said lands, or any part of them, for the purpose of *exploring, mining* and *using the*

*timber* thereon;" these comprehend every use of which such lands were capable, and which the most unqualified possession and title could confer.   The subsequent clause that this use should not be so construed "as to dispossess Brant until payment of the purchase money," is manifestly only a precautionary clause, to guard against any difficulty in the enforcement of the purchase money.   Regarding Green, then, as a purchaser in possession, and under a deed of general warranty, which, under the decrees of the courts of Maryland and Virginia, he holds both from Brant and Beall, what should be the measure of his relief if there be the defects of title complained of?

In *Pickett* vs. *Pickett*, 6 Ohio State Reports, the supreme court of that State held, that a purchaser of land who has received a deed containing a covenant of warranty, cannot plead to an action on the bond given for purchase money, defect of title, unless he has been *evicted* by title paramount. The court of appeals of Virginia has, in favor of purchasers, gone beyond the doctrine sanctioned by the courts of chancery of England; yet even in that State it will not interfere on behalf of a vendee, who has taken possession under a conveyance, upon any allegation of defect of title, unless the title was questioned by a suit, either prosecuted or threatened. 3 Ran., 44. The vendee has not the right in a case of this kind to ask of the vendor to deduce his title; it is for him to prove the defect, and if none be shewn by him, he is entitled to no relief. 5 Mun., 295; 4 H. & M., 376; 1 Leigh, 125. An actual suit *pending* seems by Chancellor Kent to have been deemed sufficient. 2 Johns., 547. Chancellor Tucker, in his notes, p. 474, 2d vol., shews the great embarrassment that must result from the application of the principle, that a purchaser may be relieved on the ground of defect of title, unless there has been *an actual eviction.*

12th. It is said Green parted with his interest in his contract with Brant on the 8th of May, 1839.   He did so by subscribing to fifteen thousand shares of the Union Potomac Company, and assigned his interest in the contract in payment of his stock, "*The said company binding itself to*

*pay the deferred payments for the lands lying in Virginia,"* From the Union Potomac Company this contract passed to the New Creek Company, whose name was changed by act of assembly to the Piedmont Iron and Coal Company. This was simply an assignment of the equitable interest of Green in that contract, and was made as is conceded throughout the case, with full *notice* of the purchase money due, accompanied with an obligation to discharge the same. The assignees of Green being either purchasers *pendente lite*, or where subsequent to the decree, purchasers with full notice of· the equities of Brant, have acquired no rights different from those of the vendee Green. 1 Daniel, Chancery Prac., 328;.1 Story's Equity, section, 406; Story's Equity Pleading, section 156.

13th. Authorities have been cited to show that no bill in equity can be maintained in the name of a plaintiff who has divested himself of all interest in the subject matter of the suit. This may be true as to a plaintiff without such interest *at the date of the institution of the suit;* but no case, it may be very safely asserted, can be found either in the English or American courts which would apply the doctrine to an assignment made *subsequent* to the institution of the suit. In this case, the suit was commenced in July, 1840; the assignment by Brant to Beall was made in May, 1846. Nor is the question affected by the filing of the amended bill by Brant's administrator in 1848. The *amended*, is but a continuance of the original bill, and is regarded as forming a part of it; both the original and amended bill constitute but one record. 1 Daniel, Chan Prac., sec. 8, p. 455. See agreement of counsel, p. 134, consenting that Beall's assignments be filed and suit continued for his use. If, upon a proposition so clear and illustrated by every day's practice, any authority is deemed necessary, see Story's Equity Pleading, chap. 4, sec. 156.

BROWN, President. The important question arising on the record for the consideration of this court, in this case, is whether the decree of the Maryland court concludes all in-

quiry into the validity of the title to the Virginia lands in the Virginia courts, wherein the vendor seeks specific performance and a sale of the Virginia lands to pay the balance of the price not paid by prior payments and by the sale of the Maryland lands under the decree of the Maryland court. I should be very slow to reconsider a question which had been considered and adjudicated by a court of competent jurisdiction of another State of the Union. But the difficulty·in the present case is not the competency of the Maryland court, but what it did decide and what it did not.

John Brant, by written indenture, sold to General Duff Green several tracts or parcels of land, part of them situated in Maryland and the rest in Virginia, for a large sum of money, payable as therein specified. Brant filed his bill in the county court of Alleghany county, Maryland, to enforce ·his vendor's lien and for a sale of the lands to satisfy the ·price remaining unpaid. The Maryland court decreed that Green pay the purchase money, less the payments made in part, in a given time, and upon default that the Maryland lands be sold and the.proceeds applied *pro tanto* to the debt, which was done. The said court, however, first seeing that the title to the Maryland land was perfected, before sale, by a deed with general warranty from Brant to Green, with the relinquishment of the dower right of Brant's wife to the same. This is substantially what that court did. The bill in the Maryland court was general, and prayed for a sale of the lands without limiting the prayer to the Maryland lands. And that court might undoubtedly have gone further than it did and have decreed a sale of the Virginia lands also, and applied the proceeds to the purchase money, and as incidental thereto it might have compelled the parties then before it to unite in conveying the Virginia lands to its com- .missioner, and then had them sold and conveyed by him under its order; and it might very properly upon having a proper case made requiring the investigation of the validity of the vendor's title to the Virginia lands, have instituted an inquiry in that behalf, and tested the title to the same by the laws of Virginia; and however inconvenient, and per-

haps unsatisfactory, such an investigation might have proved in a foreign court, and however appropriate and preferable it might be supposed to have had the question of title to the Virginia lands investigated and determined under the laws of Virginia by a Virginia court; yet would the decree of the Maryland court be conclusive upon the parties in such case of everything so considered and, in fact, determined; unless, perhaps, the Virginia court should plainly see that the Maryland court had clearly mistaken the law of Virginia applicable to the case. Indeed, the Maryland court might, in such case, have also compelled Brant to execute a like deed to Green for the Virginia lands, with general warranty and with the relinquishment of his wife's dower right therein, and deliver the same for record in Virginia at or before such sale; but the Maryland court did not do so. It neither considered nor decided the question of title to the Virginia lands, nor did it decree a sale even without such inquiry and determination. Having exhausted the Maryland land it ceased to exert its powers in the premises. And the reason is manifest upon the whole record of the case. It was not in the contemplation of the parties, their counsel, nor the court to investigate the defects of title and dispose of the Virginia lands in the Maryland suit. And very shortly after the Maryland decree, and before the sale of the Maryland lands, the vendor Brant filed his bill in the circuit court of Hampshire county, where the Virginia lands were situated, to foreclose his vendor's lien and for a sale of those lands to pay the purchase money. The pendency of this Virginia suit and its object were known and recognized by all in the Maryland case as appears by the record in that case and the agreements of the parties filed therein referring to that suit.

It is claimed that the Virginia suit was but a foreign attachment, under the statute, in substance and fact, though not so in form, to subject the Virginia lands not to the vendor's lien but to satisfy the Maryland decree, but the facts do not sustain the theory, however plausible. That was a new view taken many years after by the administrator of

Brant, and the conclusiveness of the Maryland decree urged as an estoppel to all inquiry into the question of title to the Virginia lands then sought to be sold. The object of the Maryland suit was to enforce the vendor's lien on the Maryland land, and clearly so understood and intended by all the parties, and the Maryland court. The vendee questioned the title to the land, and averred the inability of the vendor to make a good title, and that was perfected before sale, by the deed of Brant, the vendor, to the vendee, with the relinquishment of the dower right of the vendor's wife, according to the laws of Maryland. It was not necessary to that object, that is to a sale of the Maryland lands, to investigate and determine in the Maryland court the title to the Virginia lands, as it was not in contemplation to sell the latter in that suit but that was left for the Virginia court in the Virginia suit, then pending for that purpose, and so known to all the parties and to the Maryland court, else why did the Maryland court stop short of its duty with granting but half relief?

I think, therefore, upon an inspection of the whole record, that the Maryland decree neither determined nor concluded anything respecting the title to the Virginia lands, but that that question was, and is still, open to investigation, according to the contract of sale sought to be enforced. And it seems the learned judge who decided the case in the Hampshire court was not free from difficulty in maintaining the Maryland decree to be conclusive against such inquiry, when he disregarded the declaration which he had made of its conclusiveness so far as to permit the inquiry into the title of a moiety of one of the tracts of land in question. But if the said decree be conclusive as to any of said tracts why not as to all of them, and if not conclusive as to the whole why so to any part? I think, therefore, that the decrees of September 20th, 1854, and April 21st, 1859, are erroneous in holding the Maryland decree conclusive and excluding the inquiry into the validity of the title to said lands, and also in dissolving the injunctions before such inquiry should be had. Those decrees, therefore, should be reversed so far as

they conflict with these views, and the cause remanded to the circuit court of Hampshire to be there further proceeded with in conformity to the views above indicated. But in any inquiry which may there be had respecting the alleged defects of title to the said lands, the question should not be exclusively as to what defects existed in Brant's title at the time of the sale, but rather what defects now exist therein, if any, which would defeat the possession or enjoyment of the land by the vendee; for however defective the title may have been originally if the vendee has had and held the possession thereof under it, till the defect has been cured by lapse of time or the statute of limitations, he should not be allowed to set up such pretended defect. And should it be found that the questions of title cannot be determined without resort to actions at law the parties should be required to do it to enable the court of equity to make a complete and final disposition of the case.

Nor does the record show whether the lands in question have been held in the possession of the vendor and vendee or either of them, or whether by the claimants of the alleged older and adverse title, so that this court cannot determine the question of title in the premises.

Judge Maxwell concurred.

DECREE REVERSED.